Judge Carr
delivered his opinion.
This is an action brought by Ruth and her children against Sallust, claiming their freedom. The ground on which they rest their claim, is, not that they were never rightfully held in slavery, but, that being slaves in the State of North Carolina, they were imported into this State, in violation of the Act of 1778, and are, therefore, under the third section of that Act, free. The defendant in the Court below demurred to the evidence; upon which demurrer, judgment was given for the plaintiffs, and the defendant appealed.
The case, as presented by the evidence, seems to be this: Some years prior to 1780, John May, residing in Anson county, North Carolina, owned a negro slave called Esther. He died, leaving this slave in possession of his wife Susanna May. What was the exact nature of Susanna’s interest in this slave, we do not know, except from the evidence of Judith and Elizabeth Lowry, daughters of Susanna, who both say that she belonged to their mother. After the death of John May, Esther had a daughter called Ruth, the plaintiff in this action. Susanna May married Lewis Lowry; who, about the time of Gates’s defeat (16th of August, 1780,) carried Esther and Ruth, (then about 5 years old) to South Carolina; with what intention, whether to avoid the enemy, or to sell the slaves, we are not informed. Theré, they were taken from his possession, and car *69 ried to Virginia. Elizabeth Lowry saw them in possession of Pigg, near Camden, and heard her mother claim and demand them. Pigg refused to give them up. He carried them to Pittsylvania, the county of his residence, (as his wife E. Gray tells us) and held them there as slaves, till his death. He had a bill of sale for them, which his wife, and Corder and wife, say, they saw; but neither of them tells us, by whom it was given. In 1784, Pigg made his will, in which he directs these slaves to be sold, and that the buyer should be told, that there was a dispute in the title, of which he was to take the risque. E. Gray tells us, that this provision was inserted in consequence of a claim set up to the slaves, by Lowry and May, about three years before the date of the will. After the death of Pigg, his widow administered on his estate. She married Adam Gray, who, in 1791 or 1792 (see Goodson and Wall’s evidence) took Ruth to the county of Montgomery, and sold her to the defendant Sallust In 1794, Robert Lowry went before a Justice of the peace to prove his right to Ruth; but the Justice refusing to act, he brought an action of detinue for her. The writ is dated, 19th of August, 1794. At the October rules, 1794, security for costs was required of the plaintiff; and not being given, at the November rules, it was ordered, that the suit be dismissed; which order, at April Court, 1795, was set aside, security entered, and the declaration filed; and at'June Court, 1795, (the record shewing no plea pleaded, or issue joined,) a jury was sworn, and returned a verdict for the plaintiff for the slave Ruth, if to be had, if not, the sum of 64/. her value. The day after this trial, the slave was sold to the defendant Sallust. The bill of sale is signed by R. Lowry, John May, and John Lowry. The price was 80/. which, the witness Wales tells us, he saw paid. Lowry was never in possession of Ruth, after the sale of her by Gray to Sallust.
The first question arising on this case, is, did the importation of these slaves into this Commonwealth, by Pigg, *70 amount to such a violation of the Act of 1778, as entitled ^le slaves to their freedom ?
It was contended, (though, as it seemed to me, not with much confidence,) that by the act of importation, the forfeiture was incurred, and the slaves entitled to their freedom, though Pigg, the importer, should be found to have no property in them. This would be giving to the general words of the statute, a most harsh and revolting construction. The Act is highly penal. . It inflicts on the importer 1000Í. penalty, for every slave imported; and the loss also of all property in the slave. But, surely, these punishments were intended for the guilty violator of the law only, not for the innocent sufferer by that violation also. It could never be the intention of the Legislature to say, that if a man residing in another State, was so unfortunate as to have his slaves stolen from him, and brought into Virginia, he should incur either the penalty of 1000Í. or the forfeiture of his property. Against such a construction, both reason and authority cry aloud. By the 1st chap, of the Statute of Gloucester, 2d Institutes, 283, it is among other things enacted, ■“ that the disseisee shall recover damages in a writ of entry founded on a disseisin, against him who is found tenant after the disseisor. ” Upon this clause, Littleton, sec. 685, puts this case. If a man be disseised of landj and the disseisor enfeoff B. C. and D. and livery of seisin is made to B. and C. but D. was not present, nor ever agreed to the feoffment, nor ever would take the profits, &c. and after B. and C. die, and the disseisee bringeth his writ in the per against D. he shall shew all the matter in defence, and the demandant shall recover no damages against him; though he comes directly within the letter of the Statute, being found tenant of the freehold. Upon which my Lord Colee observes, “ Here it appeareth that Acts of Parliament are to be so construed, as no man that is innocent or free from injury or wrong, be by a literal construction, punished or endamaged.”
*71 in South v. Solomon, 6 Munf. 12, a tenant for life of slaves, had brought them into the State, contrary to law; and the question was, whether this would entitle them to their freedom. The Act of 1792, under which this question arose, differs from that of 1778, with íespect to the importation of slaves, in nothing but requiring a residence of 12 months to complete the forfeiture. The words of the 2d section are, in every other respect, equally broad with those of the law -of 1778. Upon this case, Judge Moane, delivering the opinion of the Court, says: “The Court is of opinion, that the 2d section of the Act of 1792, only extends to cases of slaves brought in by the absolute owner of them, and not to such as are brought in by wrongdoers, or by those having only a limited interest in them. We are not disposed to give a construction to the general words of an Act, which would subject the property of innocent individuals to loss, by the acts of third persons.” I conclude, therefore, that if Pigg,'the importer, had no property in the. slaves Esther and Ruth, his importation of them did not forfeit the right of the true owners, or entitle the slaves to their freedom.
How stands the question of Pigg’s title? The record making part of the evidence demurred to, shews a recovery of Ruth from the vendee holding under Pigg by Loiory the North Carolina claimant. The admissibility of this evidence cannot come in question on the demurrer. Besides, it was produced by the plaintiffs themselves, as a part of their case. It was said, however, that it ought not to prejudice them, being res inter alios acta. Let it be remembered, that the plaintiffs, aknowledging that they were slaves before their importation, claim freedom solely through the violation of the law. To ascertain this violation, we are forced upon the enquiry, whose property they were; and it is upon this question of property, that we resort to the record. To establish that point, I thftik it not only admissible, but decisive evidence, unless the effect of it can be destroyed by the objection taken, that-it was al *72 together a fraudulent and collusive proceeding to evade the law. Looking into the origin, and tracing the progress of the transaction, I confess that I can see nothing like collusion in this North Carolina claim, but on the contrary, strong marks of an adversary title, seriously prosecuted* In the very commencement of Pigg’s possession, we see that Mrs. Lowry claimed and demanded the property of him. We are told, that the claim was renewed about 17S1 or 1782. In Pigg’s will, dated in 1784, he considers it so serious a claim, that he directs the slaves to be sold with a disclosure of the dispute, and a sale of his right only. When Z?. Lowry, in 1794, came to Virginia to prosecute his claim, we hear of no communication with Sallust. He went to a justice, and when he refused to act, he employed a gentlemen standing high in the profession, (Allen Taylor, if I mistake not,) and the suit was immediately brought. This did not look like collusion. At the October rules, security for costs was demanded, and not being entered, there was an order of dismission at the November rules. This has very much the appearance of a real adversary proceeding. At the April Court 1795, this order of dismission was set aside, security given, and the declaration filed. In the June following, the verdict and judgment were rendered. It is true, that we see nothing in the record of a plea or issue joined, and if the question were, whether this omission constituted such error as would reverse the judgment on appeal, I suppose there would not be much difficulty. But, where it is adduced as a proof of collusion, I confess that it has very little weight on my mind. We all know how loosely and carelessly these things are done in the hurry of a law trial; and the verdict of the jury proves, that they must in fact have been sworn upon the very point in issue between the parties; for they find for the plaintiff the slave in the declaration, if to be had, if net 64/ her value. The sale too, of the woman, has every appearance of a real transaction. The price was a full one, for a woman, at that day; 16/. more than the *73 jury valued her at; and Walls, the witness states, that he saw the money paid. I cannot see any thing of collusion in all this.
It is objected, that Loiory himself said he was only one of the heirs who claimed the negro. The answers to this, seem to be, 1st, that the verdict (ovendf this hearsay of Lowry be received,) overweighs it; 2d| that whether the title be in Lowry alone, or in him jointly with others, it is equally decisive to shew, that Pigg Sad no title. Nor does the fact that the bill of sale was signed by John May, and. John Loiory, as well as Robert, prove any thing as to property, in my mind. We know that a man often requires surety in such eases. Sallust might well have learned caution; for, this was the second time he was paying for the slave, in the course of three years. He might therefore have said to Robert, “you live out of the State; your right may be hereafter questioned; you must therefore give me surety;” and the other two may have signed the bill of sale with this view. If it be said that this is conjecture merely, I answer, that the transaction is one of that dubious character, upon which nothing but conjecture can be founded, and this seems quite as plausible as any other.
But it is objected, that this sale of the slave in Virginia, by Robert Lowry, connects him with the original importation: that it is a sanction of that importation; and subjects him to the forfeiture denounced by the Statute; and that, to permit such a proceeding, would open an easy door to the evasion of the law. I answer, that whenever a case is brought before us, shewing probable grounds to suspect such evasion, I shall be as prompt as any one to enforce the Statute. But we must not forget, that it is a penal law, and should be taken strictly. It seems clear from the whole context, that the prohibition to sell, extends to those cases only, where the original importation was in violation of the law, and forfeited the property. Here I have shewn (I think,) that it was not so; and when we consider, that between the importation and the sale, *74 there was a lapse of 15 years, and that the parti.es to 'the different transactions were wholly changed; it se«ms difficult so to connect them, as to make them one. A child of five years old, is brought from Carolina, without the consent of her owner. She grows up; passes through several hands; at length, her owner comes after her, and recovers her by suit. She has been 15 years an inhabitant of the State. ■ This is her home; here are her connexions; and, instead of breaking up these connexions and carrying her to a strange land, her master sells her here. This certainly was no sin against humanity. It does not come within the letter of the law; nor do I think it opens such a door to the evasion of the Statute, as should induce us to stretch this penal law, so far as to take it in.
The other Judges concurred, and the judgment was re* versed.